IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | CRIMINAL ACTION NO. |
| MICHAEL COOPER, | 1:18-CR-118-SCJ-CMS |
| Defendant. | |

## **FINAL REPORT AND RECOMMENDATION**

On April 10, 2018, a grand jury sitting in the Northern District of Georgia returned a four-count indictment against Defendant Michael Cooper ("the Indictment"). [Doc. 1]. Defendant is charged with conspiracy to knowingly make a false and fictitious written statement to a federally licensed firearms dealer (Count One), making a false statement to two different licensed firearms dealers on January 9, 2017—Arrowhead Pawn Shop (Count Two) and Liquidation Outlet Center (Count Three)—and with being a felon in possession of a firearm on January 9, 2017 (Count Four). [Id.]. The Indictment also contains a forfeiture provision. [Id. at 8–9].

The following motions are presently before the Court: Motion to Suppress Cellular Geo-Location Data [Docs. 28, 29] and Motion to Suppress Identification Testimony [Docs. 25, 31]. I will address these motions in turn.

### I.     Motion to Suppress Cellular Geo-Location Data

On June 22, 2018, the Supreme Court issued its decision in <u>Carpenter v. United States</u>, concluding that the acquisition of historical cell site records constitutes a search within the meaning of the Fourth Amendment, and that law enforcement must obtain a warrant supported by probable cause before acquiring such records. <u>See</u> 138 S. Ct. 2206, 2220–21 (2018).  The <u>Carpenter</u> decision overturned prior Eleventh Circuit precedent articulated in <u>United States v. Davis</u>, in which the Eleventh Circuit held that obtaining documents and records (including cell site data) from third parties under the Stored Communications Act did not amount to a search under the Fourth Amendment and therefore a warrant was not necessary to obtain cell site data.  785 F.3d 498, 511 (11th Cir. 2015).

One month after the <u>Carpenter</u> decision was issued, Defendant filed the instant motion to suppress in which he states that the Government executed a search warrant for his home in Pennsylvania and that the probable cause for the warrant came, in part, from historical cell site information acquired under the Stored Communications Act without a warrant.  [Docs. 28, 29].  He argues that <u>Carpenter</u> requires suppression of any cell site evidence obtained under the Stored Communications Act without a warrant as well as any evidence obtained via a warrant that relied on such evidence.  [Doc. 29 at 1].

In United States v. Joyner, the Eleventh Circuit held that if, prior to the Carpenter decision, prosecutors and agents acted in good faith in obtaining historical cell site data without a warrant, then the good faith exception to the exclusionary rule articulated in United States v. Leon, 468 U.S. 897, 922 (1984), may apply.  See United States v. Joyner, 899 F.3d 1199, 1204–05 (11th Cir. 2018) (relying on Leon to conclude that the district court's denial of a motion to suppress based on the Government's failure to obtain a search warrant for cell site data did not constitute reversible error).

Here, the order authorizing the disclosure of historical cell site data was signed on December 15, 2017, six months before the Carpenter decision was issued.  [Doc. 29-1 at 13].  As noted above, in December 2017, the binding case law in the Eleventh Circuit instructed that a court order under the Stored Communications Act was the proper way to obtain historical cell site data.  It appears that in obtaining the cell site data in this case, the prosecutor complied with the requirements of the Stored Communications Act, as interpreted by the Eleventh Circuit at that time.  Defendant has presented no argument or evidence to suggest that the prosecutor's actions were not taken in good faith.  I conclude that the reasoning of Joyner applies in this case and that it is appropriate to apply the Leon good faith exception to the exclusionary rule to the cell site data obtained

here, even though it was acquired without a warrant. Accordingly, I recommend that the Defendant's Motion to Suppress Cellular Geo-Location Data [Docs. 28, 29] be DENIED.[1]

## II. Motion to Suppress Identification Testimony

On November 1, 2018, I held an evidentiary hearing on Defendant's challenges to two witness identifications.[2]  [Docs. 25, 31].  At the hearing, the Government called two witnesses, and Defendant called none.  [Doc. 50, Transcript ("Tr.") at 2].

A. <u>Evidence Presented at the Evidentiary Hearing</u>

*Identification by Ashlie Onyedika*

The Government's first witness was Daniel Abou-Jaoude, a special agent with the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF"). Special Agent Abou-Jaoude testified that on September 21, 2017, he was assisting in a proffer interview of Ashlie Onyedika, a former sales clerk at the Liquidation Outlet

---

[1] Additionally, Defendant has failed to present any evidence (or even argument) showing that he ever owned, controlled, used, or possessed the phone in question.  Without any such evidence, Defendant has failed to establish standing to challenge the Government's acquisition of the cell site data.

[2] Defendant had also challenged the identification by Quintavious Stokley and Cory Miller.  [Doc. 25 at 1; Doc. 31 at 6].  Thereafter, Defendant withdrew his challenge to the Stokley identification, and the Government indicated that it did not intend to introduce the Miller identification in its case-in-chief.  [Doc. 50 at 4].

Center, in the United States Attorney's Office in Atlanta. [Tr. at 14–15; Gov. Ex. 12]. At the time of the proffer session, Ms. Onyedika had been charged in an indictment but was not in custody. [Gov. Ex. 13; Tr. at 15, 46–47]. Several people were present at the proffer session including two Assistant U.S. Attorneys, Ms. Onyedika's defense counsel and paralegal, and four ATF agents including Special Agent Abou-Jaoude. [Tr. at 15]. The Report of Investigation ("ROI") documenting the proffer session reflects that Ms. Onyedika discussed her knowledge of the scheme before being shown any photographs. [Doc. 55-1 at 1–2].

Special Agent Abou-Jaoude testified that during the proffer session, Ms. Onyedika was shown a "photo pack" that included eleven individual color photographs. [Tr. at 18–20, 52–53]. The pack included a mixture of males and females. They were all in color and of a similar size and looked as if they were copies of government identification photographs. [Id. at 20, 44].

Special Agent Abou-Jaoude testified that ATF Special Agent John Gray presented the photographs to Ms. Onyedika one at a time and asked her if she recognized the individual in the picture. [Tr. at 18–20]. Special Agent Abou-Jaoude testified that no one told Ms. Onyedika who the people in the photographs might be, and that there was no prompting about who she should identify. [Id. at

19].  The eleven photographs were admitted into evidence as Government Exhibits 1 through 11.  [Gov. Exs. 1–11; Tr. at 20–21].

At the hearing, Special Agent Abou-Jaoude testified regarding each picture, and he confirmed the following: that he showed each photograph to Ms. Onyedika; that she was given as much time as she needed to review each photograph; that there were no identifiers on any of the photographs such as the person's name or height; that each was placed on the table in front of Ms. Onyedika; that no one told Ms. Onyedika who was depicted in the photograph or what that person was suspected of having done; and that no one said anything to prompt Ms. Onyedika to make an identification.  [Tr. at 21–45].

Of the people depicted in the photographs, Ms. Onyedika was able to identify only one by name, the person in Government Exhibit 1.  [Tr. at 68].  She stated that his name was "Supreme" and that he had come into the store often and would bring other people with him to make large-quantity purchases of firearms.  [Id. at 22–23].  According to Special Agent Abou-Jaoude, Ms. Onyedika stated that she believed Supreme was from up north and had been coming into the store since 2016.  [Id. at 23].  She then wrote on the photograph, "I recognize this person as Supreme," and signed and dated it.  [Id.].

Special Agent Abou-Jaoude testified that Government Exhibit 8 is a photograph of Defendant. [Tr. at 38]. According to Special Agent Abou-Jaoude, when Ms. Onyedika viewed Government Exhibit 8, she said that the person "looked familiar" and that she had seen him with Supreme. [Id. at 37]. She also stated that she could not recall if she sold firearms to the person in Government Exhibit 8. [Id. at 37, 55]. Ms. Onyedika did not sign Government Exhibit 8. Special Agent Abou-Jaoude testified that Ms. Onyedika did not sign photographs if she did not know the name of the person depicted. [Id. at 37, 41, 55, 68–71]. Special Agent Abou-Jaoude testified that Ms. Onyedika "appeared confident" when talking about Government Exhibit 8. [Id. at 38, 66].

*Identification by Mark Eiken*

The Government's next witness was Gary Dorman, a special agent with the ATF. [Tr. at 72]. Special Agent Dorman testified that on May 2, 2017 he assisted Special Agent Gray with an interview of Mark Eiken, a person who the agents believed may have sold a Glock .22 to Defendant. [Id. at 81, 86]. They believed that Mr. Eiken had listed the gun for sale on ARMSLIST, an internet site, and that Defendant had responded to the advertisement. [Doc. 55-1 at 17; Tr. at 86].

According to Special Agent Dorman, the agents called Mr. Eiken on the phone, told him that they were ATF agents conducting an investigation and that his

name had come up as a witness. [Tr. at 82]. They asked if Mr. Eiken would be willing to meet with them at a time of his choice, and Mr. Eiken agreed. Special Agent Dorman testified that they had no plans to arrest Mr. Eiken, and that they told him he was not in trouble. [Id. at 81–84, 111]. At Mr. Eiken's suggestion, they agreed to meet at a local Starbucks that was close to the church where Mr. Eiken worked as a pastor. [Id. at 82, 86, 111].

At the meeting, the agents asked Mr. Eiken if he had any information in his phone about the sale of the Glock .22, and Eiken located a string of text messages that he showed to the agents. [Tr. at 87]. He then told them that he recalled selling the gun in February 2017 to an African-American man from Stone Mountain who drove a Dodge Dart. [Id. at 88–89].

Special Agent Dorman testified that Special Agent Gray showed Mr. Eiken four photographs, one at a time. [Tr. at 90–91]. He testified that for each picture, Mr. Eiken was given as much time as he wanted to review the picture, and that Mr. Eiken was not pressured or prompted in any way to make an identification. [Id. at 91]. Special Agent Dorman testified that the agents did not tell Mr. Eiken who was depicted in the photographs and that the pictures did not have identifiers on them such as name, height or weight. [Id. at 91]. The photos were admitted into evidence. [Gov. Exs. 14–17; Tr. at 92–93].

At the hearing, the Government asked Special Agent Dorman to review each of the four photographs, and he confirmed the following: that each was a color headshot; that each was shown to Mr. Eiken separately; that Mr. Eiken was given as much time as he needed to look at each photograph; that there were no identifiers (such as the person's name, height, or weight) on any of the photographs; that no one told Mr. Eiken who was depicted in the photograph or what that person was suspected of having done; and that no one said anything to prompt Mr. Eiken to make an identification. [Tr. at 93–104]. During the meeting, Mr. Eiken was not under arrest, was not threatened with arrest, and was not restrained in any way. [Id. at 84, 102–04].

According to Special Agent Dorman, Government Exhibit 16 is a photograph of Defendant. When Mr. Eiken got to the picture identified as Government Exhibit 16, Mr. Eiken stated that the image "looked like the person" who purchased the firearm from him. [Tr. at 97, 99–100]. Mr. Eiken then asked how big the guy was. [Id. at 98]. According to Special Agent Dorman, Special Agent Gray answered that the person in the picture was five-seven, 250 pounds, at which point Mr. Eiken said "yeah, he was a heavy-set guy." [Id. at 98]. Mr. Eiken did not sign or date the photograph. [Id. at 100]. The meeting lasted approximately forty-five minutes. [Id. at 124]. The ROI documenting the

identification states that "EIKEN looked at the photograph and stated that he possibly could be the guy who bought the firearm."  [Doc. 55-1 at 16].

B. Legal Standard

Pre-trial identifications may violate a defendant's Constitutional due process rights when "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968); see also Neil v. Biggers, 409 U.S. 188, 198 (1972) ("It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.").  When determining the admissibility of a pretrial identification, "reliability is the linchpin." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Courts use a two-step analysis to assess the admissibility of a pretrial identification. United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001).  The first step is to determine whether the identification procedure used was unnecessarily suggestive, and it is the defendant's burden to make this showing.  If the Court determines that the procedure was unnecessarily suggestive, the Court

must then go on to the second step and determine whether, under the totality of the circumstances, the identification is reliable despite the suggestive nature of the procedure. Id.

With regard to the first question—whether the identification procedure was unnecessarily suggestive—courts generally look at the number of photographs shown to the witness, the nature of the photographs shown to the witness, and the agent's conduct when presenting the photographs. As the Supreme Court stated in Simmons, the risk of misidentification is:

> increased if the police display to the witness only the picture of a single individual who generally resembles the person [the witness] saw, or if they show [the witness] the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.

Simmons, 390 U.S. at 383 (internal footnotes omitted).

As discussed above, even if the procedure is unnecessarily suggestive, the evidence will not be excluded unless it is also shown to be unreliable. See Brathwaite, 432 U.S. at 114–17 (noting that when a procedure is unnecessarily suggestive but the identification is otherwise reliable, the evidence should not be excluded because the defect in the procedure; suggestiveness "goes to weight and not to substance"). To make this determination, courts consider the totality of the

circumstances, including whether the witness had an opportunity to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the suspect, the level of certainty demonstrated by the witness at the time of identification, and the length of time between the crime and identification. Biggers, 409 U.S. at 199–200. For an identification to be unconstitutionally unreliable, there must be a substantial risk of misidentification, and courts consider the totality of the circumstances in making this decision. See id.

### C. Defendant's Critiques of the Procedures Employed

Defendant argues that the procedures used for both witnesses at issue here were unduly suggestive for the following reasons: the identifications were made under "coercive conditions"; the agents who showed the pictures were involved in the investigation and knew who Defendant was; the agents did not give any cautionary instructions; the agents did not obtain a statement from the witnesses about their degree of confidence; and the interviews were not recorded. [Doc. 59]. Defendant also argues that Ms. Onyedika's identification is flawed for the additional reasons that it was not made in private and that other suspects' photos were included in the photo pack. [Id.].

The basis for Defendant's complaints about the identifications is a memorandum issued by the United States Deputy Attorney General dated January 6, 2017 (the "Memorandum"). [Doc. 59-1]. The Memorandum addresses procedures for obtaining identifications through photo arrays where the perpetrator is a stranger to the witness, and it sets out a number of best practices. [Id. at 1]. Defendant's critiques are based on his belief that the agents in this case should have followed all of the recommendations in the Memorandum. The Government contends that the Memorandum is irrelevant because these identifications were not made through photo arrays and that by its terms, the Memorandum does not carry the force of law, nor does it create any substantive or procedural rights. [Doc. 65 at 14–15].

D. <u>Discussion</u>

In this case, there is nothing about the pictures themselves that was unduly suggestive. All the photographs were color photos shots of the face and were approximately the same size. There is no one photograph in any of those shown to the witnesses that stands out in terms of color, size, or any other feature that might emphasize it or make someone more likely to pick it. None of the individuals was depicted more than one time. The photos were not "mug shots." There is also

nothing in the record to suggest that any of the photographs of Defendant unfairly suggested that he was involved in criminal activity.

Moreover, there was nothing suggestive about the way that the agents presented the pictures. For example, there was no evidence that the agents emphasized any particular photograph or that either witness had previously been shown a photograph of Defendant before making the identification. And there is no evidence that law enforcement guided the witnesses or even suggested that anyone depicted in the photographs had committed a crime. Defendant has presented no evidence that the agents communicated any information about him to the witnesses with the purpose or effect of influencing their identification.

Furthermore, there is nothing in the evidence to suggest that the agents were anything other than professional and courteous with the witnesses. There is no evidence that the witnesses were threatened, prompted, or pressured in any way to make an identification. There is no evidence that the witnesses were told anything whatsoever about the people in the photographs. As a person charged in the case, Ms. Onyedika obviously was aware of the investigation, but there was no evidence that the procedures used by the agents suggested that she should identify the particular picture of Defendant.

Under these circumstances, Defendant has failed to meet his burden of showing that the procedure in which Ms. Onyedika and Mr. Eiken chose Defendant's photograph out of the respective photo packs was unnecessarily suggestive. See United States v. Mark, No. 2006-80, 2007 WL 2669570, at *5–6 (D.V.I. Sept. 5, 2007) (concluding that a procedure in which a witness was shown a stack of photos was not unnecessarily suggestive); United States v. Goldsmith, No. 17-CR-2051-LRR, 2018 WL 1410836, at *4 (N.D. Iowa Mar. 21, 2018) (finding a procedure not impermissibly suggestive where the officers presented a witness with a stack of photos but did not direct the witness's attention to the defendant's photograph); United States. v. Bergdoll, 412 F. Supp. 1323, 1339 (D. Del. 1976) (finding nothing to indicate that a procedure was suggestive where agents handed witnesses a stack of thirty-one photographs of people who had been arrested, agents asked the witnesses whether they could identify any of the individuals, the agents did not draw attention to any particular photograph, and the character of the photographs and the persons depicted therein did not make any particular individual stand out as an obvious choice); United States v. Gaye, No. 14-344 (JRT/FLN), 2015 WL 8785745, at *14 (D. Minn. June 11, 2015) (holding that the use of a stack of photos and a photobook was not suggestive where the

witness was asked to identify anyone he recognized and was not told who might be in the photographs).

I find Defendant's critiques of the agents' conduct unfounded, at least as they relate to the issue of suggestiveness. While the agents certainly could have done some of the things that Defendant says they failed to do, such as giving a cautionary instruction or ask the witness about her degree of confidence, Defendant has cited no law holding that a failure to do such things renders an identification procedure unduly suggestive. Certainly, the Government's failure to do those things does not convert an otherwise non-suggestive procedure into an unduly suggestive one. These points may be made on cross-examination to cast doubt on the reliability of the identification, but they do not justify taking this issue from the jury.

Because Defendant has failed to carry his burden of showing that the procedures used by law enforcement were unnecessarily suggestive, the Court need not address the step-two reliability portion of the test. Accordingly, I recommend that Defendant's Motion to Suppress Identification Testimony from Ms. Onyedika and Mr. Eiken be DENIED.

## CONCLUSION

For the reasons stated, I **RECOMMEND** that all the motions discussed herein [Docs. 25, 28, 29, 31] be **DENIED**. I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 26th day of February, 2019.

*Catherine Salinas*
CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE